1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| QUINTAL RESEARCH GROUP, INC.<br><br>Plaintiff,<br><br>vs.<br><br>NINTENDO OF AMERICA, INC. and NINTENDO COMPANY LTD.,<br><br>Defendants. | Case No:  C 13-00888 SBA<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT**<br><br>Docket 45 |

Quintal Research Group, Inc. ("Plaintiff" or "Quintal"), the owner of United States Patent No. 7,425,944 ("'944 Patent"), brings the instant patent infringement action against Defendants Nintendo of America, Inc., and Nintendo Company Ltd. (collectively "Defendants" or "Nintendo").  Quintal alleges that certain of Nintendo's Game Boy handheld gaming devices infringe the '944 Patent, inter alia, with respect to the location of their thumb-activated controls.  The Court has jurisdiction over the action pursuant to 28 U.S.C. § 1338(a).

The parties are presently before the Court on Nintendo's Motion for Summary Judgment of Noninfringement.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS Nintendo's motion for the reasons set forth below.  The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

# I.     BACKGROUND

## A.     SUMMARY OF THE '944 PATENT

### 1.     Overview

Quintal is the owner of the '944 Patent, entitled "Computerized Information Retrieval System," which was assigned from its inventor and patent attorney, Richard Peterson.  The Abstract describes the invention as "a portable handheld communication device for rapid retrieval of computerized information[.]"  First Am. Compl. ("FAC"), Ex. 1 ("'944 Patent"), Dkt. 13-1.  The communication device or "microdeck" is designed to "interconnect with network computer consoles or communication systems for access to a larger data net" and to "optimize data input and output without the use of a keyboard," Id., col. 3 ll. 43-46, col. 5 ll. 7-9 & 20-25, col. 6 ll. 18-23.

The microdeck is the size of a deck of cards, "having a generally rectangular shape with a display screen [152] on one side that has a frame with ergonomic placement of finger controls [160] including a pair of thumb controls on either side of the screen [166] with a pair of finger controls on the top of the display with a least one of the finger controls being a cursor or pointer control."  '944 Patent, Abstract.   In addition, there are a pair of thumb select buttons [162/164] on the underside of the microdeck that perform the same function as the thumb controls on the face of the device.  As shown below in Fig. 19A

Fig 19A

**1** (annotated) to the '944 Patent, the controls, buttons and switches on the left and right side
**2** of the centerline of the display are mirror images of one another.

**3**    The layout of the microdeck is intended "to maximize the area of the display screen"
**4** through the "ergonomic arrangement of finger controls around the perimeter of the
**5** housing."  Id., col. 5, ll. 50-53; col. 6 ll. 18-23.  The specification teaches that "[t]he
**6** perimeter controls are symmetrically arranged on each side of the center line of the display
**7** screen and the principal controls are operated either redundantly or in tandem."  Id. col. 6 ll.
**8** 18-23.  The finger controls [160] are described as a "pair of spaced cursor controls which
**9** control a single cursor (or pointer) . . . when in redundant mode, and a pair of cursors, each
**10** independently controllable when operated
**11** in tandem mode."  Id., col. 6 ll. 24-28.  A
**12** top view of the microdeck showing the two
**13** cursor controls is shown in Fig. 20
**14** (annotated) to the '944 Patent.



**15**    In conjunction with the top-mounted cursor controls, the specification calls for a pair
**16** of thumb-controlled "select buttons" [162/164] on the underside of the microdeck, as
**17** shown in Fig. 21 (annotated) to the '944 Patent.  The select buttons "correspond to the A
**18** and B mouse select buttons commonly used in a conventional mouse control."  Id., col. 6 ll.
**19** 37-42.  For the convenience of the user, the
**20** select buttons are replicated on the face of
**21** the microdeck as "redundant" thumb-
**22** operated controls [166] located on each side
**23** of the display screen.  Id., col. 6 ll. 49-52.



**24** These counterparts—referred to as "selection switches"—permit the user to perform the
**25** same function as the select buttons by using his thumb to operate rocker (i.e., toggle)
**26** switches.  Id., col. 6 ll. 50-55.  The forward rocker contact corresponds to the A mouse
**27** select button and the backward rocker contact corresponds to the B mouse select button.
**28** Id., col. 6 ll. 55-59.  The thumb controls must operate "both in a redundant mode and in a

tandem mode." Id., col. 6 ll. 39-43.  The relationship between the thumb select buttons on the underside of the microdeck and their corresponding thumb selection switches on the face of the device is shown in Figs. 19A and 21 (annotated and modified), as depicted below.



### 2. Patent Claims

The '944 Patent has two independent claims—Claims 1 and 9—both of which are at issue in this motion.  Claim 1 recites:

> 1.   A handheld microdeck having input controls for game playing and data management comprising:
>
> a rectangular display screen;
>
> a perimeter housing wherein the rectangular display screen is mounted in the perimeter housing, the perimeter housing having a back panel wherein a pocket-size unit is formed having a front with the display screen,

a back with the back panel, a top, a bottom and two sides connecting the top and bottom; and,

a plurality of **ergonomic manual controls** for operating the microdeck wherein the manual controls are mounted on the perimeter housing with two spaced finger controls mounted on the top of the pocket-size unit and **two spaced thumb controls mounted on the front of the pocket-size unit on each side of the screen** wherein at least one of the manual controls is a cursor control, wherein the two spaced finger controls and **two spaced thumb controls are symmetrically arranged on each side of the display screen**.

Id., col. 18 ll. 10-28 (emphasis added). Claim 9 is identical to Claim 1, but specifies that at least one of the manual controls is "a pointer," rather than a "cursor control." Id., col. 18 ll. 49-67. Both claims include the "symmetrically arranged" limitation, which lies at the center of the instant controversy.

**B.    PROSECUTION HISTORY**

The '944 Patent descends from U.S. Patent No. 5,452,468 ("'468 Patent"), filed on July 31, 1991. See Martinez Decl., Ex. 1 ("'468 Patent"), col. 1 ll. 7-8, Dkt. 50-1. The preferred embodiment of the invention includes a "portable, personal deck" that is a "miniature operational personal computer." Id., col. 5 ll. 5, 27-26.

On February 4, 1994, the inventor, Richard Peterson, filed for a continuation-in-part to the '468 Patent, which was granted as U.S. Patent No. 6,643,656 ("'656 Patent"). The '656 Patent added the embodiment of a "deck," that, unlike the parent '468 Patent, specifies the use of finger controls. This embodiment also appears in the '944 Patent—the patent-in-suit.

On July 1, 2005, the inventor filed an application for the '944 Patent. See U.S. Patent Appl. No. 11/173,330. During the patent prosecution process, the patent examiner added the "symmetrically arranged" limitation, ostensibly due to concerns regarding its patentability based on the prior art. Specifically, on June 8, 2008, the patent examiner conducted a telephone interview with the inventor in connection with his submission for a

terminal disclaimer.[1]  Hamilton Decl., Ex. B ('944 Patent File History, June 17, 2008, Notice of Allowance), Dkt. 45-7.  During their conversation, the inventor authorized the examiner to amend Claims 1 and 9 by adding the limitation, "wherein the two spaced finger controls and two spaced thumb controls are symmetrically arranged on each side on the display screen."  Id. at 6 (emphasis added).

On June 17, 2008, the examiner, upon obtaining the inventor's consent to his proposed addition of the "symmetrically arranged" limitation, issued a Notice of Allowance, indicating the intent of the Patent and Trademark Office ("PTO") to issue the patent and allow Claims 1 through 16.  Id. at 1.  In the section entitled "Allowable Subject Matter," the examiner stated that "Claims 1-16 are allowed since key features of the claimed invention are not taught or fairly suggested by prior art."  Id. at 7.  The examiner explained that the "closest prior art Matthews (5,432,510) teaches [a] data input device [that] includes an ergonomic arrangement of keys on [a] casing"—but that Matthews, whether considered individually or in combination of other prior art, did not read on the specified limitations, as amended by the examiner.  Id.

On July 31, 2008, the inventor submitted Amendment After Allowance Under 37 C.F.R. § 1.312 ("Amendment After Allowance") to the PTO to address alleged errors by the patent examiner in the Notice of Allowance.  Hamilton Decl., Ex. C, Dkt. 45-8 at 1-2. The claim language, as modified by the examiner, read as follows:  "

> [W]herein the two finger spaced controls and two spaced thumb controls are symmetrically arranged on each side on the display screen--.

Id. at 2 (emphasis added).  The inventor proposed amending the above claim language to instead state as follows (as denoted by the underline and strikeout):

---

[1] A patent term is limited to twenty years.  35 U.S.C. § 154(a)(2).  A terminal disclaimer is a statement that the patentee can make to limit the patent term in order to allow a subsequent patent to issue based on essentially the same subject matter as an earlier patent.  See Manual of Patent Examining Procedure § 804.02.  The terminal disclaimer means that the patentee agrees that the second patent will expire on the same date as the prior patent, thereby avoiding double-patenting rejection.  Id.  All of the patents in the family originating with the '468 Patent, including the '944 Patent, were subject to an automatic terminal disclaimer and expired on July 31, 2011.

> [W]herein the two finger spaced controls and two spaced thumb controls are symmetrically arranged on each side <u>of the centerline of</u> ~~on~~ the display screen--.

<u>Id.</u> (alterations in orig.).  The inventor claimed that the examiner's use of "on" as opposed to "in" was a "transcription error," as evidenced by the fact that the examiner properly used "of" elsewhere in the Notice of Allowance.  <u>Id.</u> at 5.  With regard to the addition "of the centerline," the inventor stated:

> To clarify what was intended and understood by Applicant and Examiner, Applicant corrects the error and adds the clarifying term, "of the centerline."  This conforms the claim terminology to the specification language, page 13, lines 14-16, where it is stated, "The perimeter controls are symmetrically arranged on each side of the centerline of the display screen . . ."  This also more accurately describes the locational symmetry of the two spaced finger controls mounted on the top of the unit as shown in the drawings.

<u>Id.</u>  On September 16, 2008, the PTO issued the '944 Patent, with Claims 1 and 9 reciting the limitation, "wherein the two finger spaced controls and two spaced thumb controls are symmetrically arranged on each side of the display screen."  '944 Patent, col. 18 ll. 26-28.  The examiner apparently did not add the "of the centerline" to the claim language of the patent, as the inventor had requested.

## C.   PROCEDURAL HISTORY

Quintal commenced the instant action in this Court against Nintendo on February 27, 2013.  Dkt. 1.  On May 8, 2013, Quintal filed a First Amended Complaint, which alleges a single claim for patent infringement, pursuant to 35 U.S.C. § 271.  Dkt. 13.  In particular, Quintal claims that Nintendo's "Game Boy Advance" and "Game Boy Dual Screen," as depicted below, infringe independent Claims 1 and 9 and dependent claims 2 and 10 of the '944 Patent, either literally or under the doctrine of equivalents.  FAC ¶¶ 12-17.

//

//

//

| Game Boy Advance | Game Boy Dual Screen |
|---|---|
|  | |

Id. ¶ 12.  Quintal also avers that Nintendo induced its customers to infringe the patent-in-suit.  Id. ¶ 18.

Nintendo now moves for summary judgment of noninfringement.  In its motion, Nintendo argues that the ordinary meaning of "symmetrically arranged" is "mirror image," such that the two thumb controls specified in Claims 1 and 9 must correspond in size, shape, and position on each side of the display screen of the handheld deck.[2]  Quintal counters that "symmetrically arranged" does not mean "mirror image," and only requires that the buttons on the device be symmetrical from a "locational" standpoint—not that the identical buttons be placed in the exact same position on either side of the display screen. Alternatively, Nintendo contends that even under Quintal's construction, Quintal cannot show that Nintendo's accused devices have one thumb control on one side of the display screen that is symmetrical to a thumb control on the other, as required by the '944 Patent.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'"  Alabama v. North Carolina, 560 U.S. 330, 344 (2010) (quoting Fed. Rule Civ. Proc. 56(c)) (citing cases).  "The burden of establishing the nonexistence of a 'genuine issue' is on the party moving for summary judgment."  Celotex

_____

[2] Although the '944 Patent refers to two finger controls and two thumb controls, Nintendo's motion focuses on the lack of two "symmetrically arranged" thumb controls as the basis for noninfringement.

1  Corp. v. Catrett, 477 U.S. 317, 330 (1986).  The movant must inform the district court "of

2  the basis for its motion, and identifying those portions of 'the pleadings, depositions,

3  answers to interrogatories, and admissions on file, together with the affidavits, if any,'

4  which it believes demonstrate the absence of a genuine issue of material fact."  Id.

5       Where the moving party meets its initial burden, the burden then shifts to the non-

6  moving party to designate specific facts demonstrating the existence of a genuine issue of

7  material fact.  Id. at 324.  "This burden is not a light one.  The non-moving party must show

8  more than the mere existence of a scintilla of evidence."  In re Oracle Corp. Secs. Litig.,

9  627 F.3d 376, 387 (9th Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

10  252 (1986)).  An issue is "genuine" only if there is sufficient evidence for a reasonable fact

11  finder to find for the non-moving party.  See Anderson, 477 U.S. at 322-23.  All reasonable

12  inferences are to be drawn in favor of the party against whom summary judgment is sought.

13  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

14  **III.   DISCUSSION**

15       "A determination of patent infringement consists of two steps:  (1) the court must

16  first interpret the claim, and (2) it must then compare the properly construed claims to the

17  allegedly infringing device."  Playtex Prods. , Inc. v. Procter & Gamble Co., 400 F.3d 901,

18  905-906 (Fed. Cir. 2005).  The Court discusses each issue, in turn.

19       **A.   CLAIM CONSTRUCTION**

20       Claim construction presents a question of law.  See Markman v. Westview

21  Instruments, Inc., 517 U.S. 370, 372 (1996).  Claim terms are generally given their ordinary

22  and customary meaning, which "is the meaning that the term would have to a person of

23  ordinary skill in the art in question at the time of the invention."  Phillips v. AWH Corp.,

24  415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  In construing a disputed claim term,

25  courts first look to the patent's intrinsic evidence, which consists of its claim language,

26  specification, and prosecution history.  Nautilus, Inc. v. Biosig Instruments, Inc., 134 S.Ct.

27  2120, 2127 (2014).  The specification is the "single best guide" for construing disputed

28  claim terms.  Phillips, 415 F.3d at 1315.  A court also may appropriately consult the

description of the preferred embodiment, <u>Pandrol USA, LP v. Airboss Ry. Prods., Inc.</u>, 320 F.3d 1354, 1363 n.1 (Fed. Cir. 2003) (citations omitted), but "must not to import limitations into the claims from the specification," <u>Trading Techs. Int'l, Inc. v. eSpeed, Inc.</u>, 595 F.3d 1340, 1352 (Fed. Cir. 2010).

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.  In such circumstances, it is improper to rely on extrinsic evidence."  <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1583 (Fed. Cir. 1996).  Extrinsic evidence may thus be considered only if necessary to assist the court in determining the meaning or scope of technical claim terms.  <u>Id.</u>  Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  <u>Phillips</u>, 415 F.3d at 1317.  Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims that can be discerned from examination of the claims, the written description, and the prosecution history.  <u>See</u> <u>Pitney Bowes, Inc. v. Hewlett-Packard Co.</u>, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing <u>Vitronics</u>, 90 F.3d at 1583).

### 1.    Intrinsic Evidence

Claims 1 and 9 both specify the use of "multiple ergonomic manual controls," consisting of "two spaced finger controls and two spaced thumb controls [that] are symmetrically arranged on each side of the display screen."  '944 Patent, col. 18 ll. 26-28. Although "symmetrically arranged" is not defined in the claims, the specification explains that the two thumb controls (i.e., selection switches) are to correspond and function identically to the thumb controls located on the underside of the deck (i.e., select buttons). '944 Patent, col. 6 ll. 36-42, 49-59.  Each thumb control is a rocker switch intended to correlate to the A and B mouse buttons, which must operate "both in a redundant mode and in a tandem mode."  <u>Id.</u>, col. 6 ll. 39-43.  Because the '944 Patent explicitly teaches the use of only two thumb controls on the face of the deck and requires that the thumb control on one side of the display must be redundant of control on the other side, one skilled in the art,

1  reading the specification, would understand that "symmetrically arranged" thumb controls

2  means that the controls are to be mirror images of one another.

3      The above conclusion is further supported by the depiction of the preferred

4  embodiment in Fig. 19A, which shows that the thumb controls are identical in size, shape

5  and location on either side of the display

6  screen.  Quintal contends that by pointing to

7  Fig. 19A of the '944 patent to support its

8  argument, Nintendo is impermissibly

9  attempting to import limitation from the

10  preferred embodiment into the claims.  Pl.'s

11  Opp'n, Dkt. 49 at 19-20.  The Court



Fig 19A

12  disagrees.  As discussed above, the specification's statements regarding the purpose and

13  intent of the two thumb controls support the conclusion that Claims 1 and 9 teaches that

14  each thumb control on either side of the display must mirror one another.  Fig. 19A merely

15  confirms this.

16      Notwithstanding the foregoing, Quintal insists that "symmetrically arranged" only

17  requires symmetry in the location of the controls.   Pl.'s Opp'n, Dkt. 49 at 6.  While this

18  interpretation may have some facial appeal, it is predicated solely on extrinsic evidence.

19  The Federal Circuit has made clear that a proposed claim construction that is untethered to

20  the patent's claims, specification and other intrinsic evidence, is untenable.  See Raylon,

21  LLC v. Complus Data Innovations, Inc., 700 F.3d 1361, 1369 (Fed. Cir. 2012) (holding that

22  a proposed claim construction that was unsupported by intrinsic evidence was frivolous and

23  warranted Rule 11 sanctions); Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319

24  (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum.

25  Rather, we must look at the ordinary meaning in the context of the written description and

26  the prosecution history."); see also Hologic, Inc. v. SenoRx, Inc., 639 F.3d 1329, 1338

27  (Fed. Cir. 2011) (holding that the district court properly referred the patent specification in

28

1    construing the disputed claim).  For these reasons, the Court finds Quintal's proposed

2    construction of "symmetrically arranged" is untenable.[3]

3                 **2.**    **Extrinsic Evidence**

4          Where, as here, the intrinsic evidence supports a proposed construction of a disputed

5    claim term, there is no need to resort to extrinsic evidence.  Interval Licensing LLC v.

6    AOL, Inc., 766 F.3d 1364 n.6 (Fed. Cir. 2014).  But even if the consideration of extrinsic

7    evidence were necessary, the Court finds that such evidence supports Nintendo's

8    construction of "symmetrically arranged."

9                 *a)*    *Dictionaries*

10         The Federal Circuit has "made clear that dictionaries and treatises can often be

11    useful in claim construction, particularly insofar as they help the court to better understand

12    the underlying technology and the way in which one of skill in the art might use the claim

13    terms."  Starhome GmbH v. AT & T Mobility LLC, 743 F.3d 849, 856 (Fed. Cir. 2014)

14    (internal quotations omitted).  In doing so, the court must be careful not to consult a

15    definition that contradicts "any definition found in or ascertained by a reading of the patent

16    documents."  Phillips, 415 F.3d at 1322-23.  In addition, "[t]he court must ensure that any

17    reliance on dictionaries accords with the intrinsic evidence:  the claims themselves, the

18    specification, and the prosecution history."  Free Motion Fitness, Inc. v. Cybex Int'l, Inc.,

19    423 F.3d 1343, 1348 (Fed. Cir. 2005).

20         Dictionaries published during the relevant time period consistently define

21    "symmetry" to mean "correspondence in size, shape, and position of parts that are on

22    opposite sides of a dividing line or center."  Hamilton Decl., Ex. D, Dkt. 45-9 (Webster's

23    Illustrated Dictionary 519 (2d ed. 1994)); see also id. Ex. E (Random House Webster's

24    Dictionary 669 (1993), defining "symmetry" as "correspondence in size, form, and

25    arrangement of parts on opposite sides of a plane, line, or point"); id. (Webster's Third New

26

27            [3] Nintendo's motion briefly cites the '468 Patent's use of the term "symmetrically arranged" in relation to computer memory architecture to support its construction of that term in the context of the '944 Patent.  The Court finds unnecessary to reach this contention

28    in light of the claim language and specification.

International Dictionary 2317 (1993), defining "symmetry" as "the property of being symmetrical; esp: correspondence in size, shape, and relative position of parts that are on opposite sides of a dividing line or median plane or that are distributed about a center or axis."); id. (Webster's Ninth New Collegiate Dictionary 1196 (1991), defining "symmetry" as "the property of being symmetrical; esp: correspondence in size, shape, and relative position of parts on opposite sides of a dividing line or median plane or about a center or axis."); id. (American Heritage Dictionary 1231 (3d ed. 1991), defining "symmetry" as "a relationship of characteristic correspondence, equivalence, or identity among constituents of a system or between different systems" or "correspondence of form and arrangement of parts on opposite sides of a boundary, such as a plane or line or around a point or axis.").

Quintal does not dispute that dictionaries may be consulted to construe claim terms or that the definitions cited by Nintendo support a "mirror image" construction.  However, Quintal asserts that Nintendo is relying "solely" on them for its proposed claim construction, has "cherry-picked" its definitions, and that its analysis is "divorced from the intrinsic evidence."  Pl.'s Opp'n, Dkt. 49 at 18.  This contention lacks merit.  As discussed above, the principal basis for Nintendo's proposed construction is the language of the claims and specification.  Despite Quintal's assertions to the contrary, Nintendo does not rely on dictionaries in isolation, but merely cites them to confirm the ordinary meaning of the disputed claim language.  Quintal's ancillary assertion that Nintendo "cherry-picked" its definitions is unfounded, as Nintendo identified multiple dictionaries, all of which consistently support the conclusion that the plain meaning of "symmetrically arranged" incorporates correspondence in size, shape, and position on each side of a dividing line — exactly as the specification does.

Quintal cites Merriam-Webster's Collegiate Dictionary's definition of "symmetrical" which defines the term as "capable of division by a longitudinal plane into similar halves" or "having the same number of members in each whorl of floral leaves." Dkt. 49 at 19 (citing Martinez Decl. Ex. 7, Dkt. 51-1 (Merriam-Webster's Collegiate Dictionary 10th ed. (1993)).  Yet, in the same dictionary, the term "symmetry" is defined as

1  "the property of being symmetrical, esp; correspondence in size, shape and relative position

2  of parts on opposite sides of a dividing or median plane or about a center of axis."  Id.  In

3  any event, Quintal's proffered dictionary definitions are unhelpful because no nexus has

4  been established between those definitions and the intrinsic evidence.  Free Motion Fitness,

5  423 F.3d at 1348. [4]

6                              **b)      *Nintendo's Patent Applications***

7         Next, Quintal asserts that Nintendo's own patent applications filed in 2010 and 2011

8  demonstrate that a person ordinarily skilled in the art would construe "symmetrically

9  arranged" as referring only to the location of the controls—and not require that the controls

10 also be the same size and shape.  Pl.'s Opp'n, Dkt. 49 at 13-15.  As noted, "the ordinary

11 and customary meaning of a claim term is the meaning that the term would have to a person

12 of ordinary skill in the art in question at the time of the invention, i.e., as of the effective

13 filing date of the patent application."  Phillips, 415 F.3d at 1312-13.  In this case, the patent

14 applications cited by Quintal were filed more than nine years after the effective date of the

15 '944 Patent.[5]  As such, they have no bearing on what a person of ordinary skill would have

16 understood at the time of the invention.

17        Even if they were germane, the Nintendo patent applications are distinguishable.

18 The Nintendo applications disclose the placement of groups of buttons that are symmetrical

19 with respect to another component.  See U.S. Patent App. No. ("App. No.") 13/049,581,

20 Dkt. # 50-3 ¶ [0078] (four buttons are "bilaterally symmetrical in position" with respect to

21 analog stick); App. No. 13/153,784, Dkt. 52-7 at ¶ [0094] (same); App. No. 13/238,535,

22 Dkt. 50-4 ¶ [0095] (four buttons and analog stick are "positioned so as to be symmetrical");

23 _____

24        [4] Quintal also argues that Nintendo's proposed construction relates to
   "symmetrically" only, and ignores the term "arranged."  Pl.'s Opp'n, Dkt. 49 at 7, 19.  But
25 the dictionary definition of "arranged" cited by Quintal demonstrates that "arranged" refers
   to the "relationship" between the two thumb controls. Id. at 19.  "Symmetrically" indicates
26 how the thumb controls are related to one another.

27        [5] The '944 Patent's effective date is based on that of the parent patent.  See Hill-
   Rom Services, Inc. v. Stryker Corp., 755 F.3d 1367, 1385 (Fed. Cir. 2014) ("the patents-in-
   suit claim priority to an application filed in 1993 and, a proper construction of the claims
28 must be tethered to that date.").

1   App. No. 12/980,620, Dkt. 50-5 at ¶ [0087] (four buttons and analog stick are "<u>placed</u>

2   <u>symmetrically to each other</u>").  In contrast, the '944 Patent does not claim a group of

3   symmetrically arranged buttons or controls.  Instead, the '944 Patent specifically claims

4   "<u>two spaced thumb controls</u> [that] are symmetrically arranged on each side of the display

5   screen."

6          Quintal also cites a Nintendo patent

7   filing in 1991, U.S. Patent No. 5,207,426

8   ('426 Patent), for a handheld game

9   controller.  Pl.'s Opp'n, Dkt. 49 at 15.

10   According to Quintal, this patent is

11   significant because it purportedly shows that

12   Nintendo allegedly "treats the four button

13   cluster <u>singularly as one unit of four</u>



14   <u>buttons</u>. . . ."  Dkt. 49 at 14-15 (emphasis in orig.).  Not so.  Neither the claims nor

15   specification of the '426 Patent recites this—nor do they make any mention of the term

16   "symmetrically."  As such, Quintal is hard pressed to claim that the '426 Patent supports

17   the notion that "symmetrically" as used in the '944 Patent only refers to the location of the

18   buttons, as opposed to their size, shape and location.

19          As an ancillary matter, Quintal argues that Nintendo should be judicially estopped

20   from claiming that "symmetrically arranged" means the size, shape and location of controls

21   on the ground that Nintendo purportedly took the opposite position during the prosecution

22   of its own patents.  Dkt. 49 at 28.  Judicial estoppel is a discretionary doctrine that may be

23   applied upon consideration of the following factors:  (1) whether the party's new assertion

24   is clearly inconsistent with its earlier position; (2) whether the party was successful in

25   persuading the earlier court to follow his first position, such that the finding of the earlier

26   court would now be incorrect and one court or the other appears to be misled in a finding;

27   and (3) whether the party asserting inconsistent positions would derive an unfair advantage

28   or impose an unfair detriment if not estopped.  <u>New Hampshire v. Maine</u>, 532 U.S. 742,

748 (2001).  Applying this test, the Court, in its discretion, finds that judicial estoppel is not warranted.  First, Nintendo's position in this litigation is not inconsistent with the prosecution of its patents.  Second, the text from the patent specifications quoted by Quintal do not show that Nintendo took any "position" or otherwise persuaded the PTO to interpret any particular claim terms in any particular manner.  Finally, Quintal has made no showing that Nintendo gained any unfair advantage by having taken any particular position during the patent prosecution process.

Quintal also cites a non-Nintendo patent assigned to Konami Co., Ltd., i.e., U.S. Patent No. 5,137,277 ("Konami Patent"), filed on January 26, 1990, for a Hand Held Video Game With Simulated Air Battle.  Martinez Decl. Ex. 12, Dkt. 52-4.  In particular, Quintal points to language in the patent specification that "buttons 34a and 34b may optionally be symmetrically located about the longitudinal center line of the casing 22, as shown." Konami Patent, col. 3, ll. 1-4.  However, the term "symmetrically located" does not appear in the patent claim.  Accordingly, the fact that "symmetrically located" is mentioned in the specification is ultimately immaterial to the scope of the patent.  Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1115 (Fed. Cir. 2004) ("the claims of a patent define the invention to which the patentee is entitled the right to exclude.").  In any event, the graphical depiction of the preferred embodiment shows that the "symmetrically located" buttons are indeed mirror images of each other, which supports Nintendo's position in this action.



### c)       Quintal's Expert Declaration

Finally, Quintal relies on the declaration of its expert, John Wharton ("Wharton"), to support its contention that "symmetrically arranged" only refers to positional symmetry. Extrinsic evidence in the form of expert testimony can be useful in a variety of areas,

including whether a "particular term in the patent or the prior art has a particular meaning in the pertinent field." Phillips, 415 F.3d at 1318.  Conversely, "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." Id. Similarly, a court should discount any expert testimony "that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." Key Pharm. v. Hercon Lab. Corp., 161 F.3d 709, 716 (Fed. Cir. 1998); see also Trilogy Comm'cn, Inc. v. Times Fiber Comm'cn, Inc., 109 F.3d 739, 744 (Fed. Cir. 1997) ("When, as here, the district court has concluded that the patent specification and the prosecution history adequately elucidate the proper meaning of the claims, expert testimony is not necessary and certainly not crucial.").

In his declaration, Wharton states:  "There is no value in having 'mirror image' symmetry of individual buttons such that they are symmetrical in size, shape, and location, and as one skilled in the art, it is my opinion that the term, [sic] symmetrically arranged on each side of the center line of the display screen refers to the general locations of the controls." Wharton Decl. ¶ 15, Dkt. 49-1.  This opinion is entirely conclusory and contrary to the intrinsic evidence. See Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971 (Fed. Cir. 1999) ("The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence").  Most notably, Wharton completely fails to address the '944 Patent's claim language, specification, or prosecution history.[6]  The Court therefore affords little weight to Wharton's declaration regarding the meaning of "symmetrically arranged."

---

[6] The Court disagrees with the Wharton's suggestion that there is "no value" in having each thumb control button be the mirror image of the other.  The specification makes clear that the microdeck is intended to be a handheld device operated with both hands of the user—with the top perimeter controls operated by the user's fingers, and the bottom and face-mounted controls operated by the user's thumbs.  The specification indicates that the thumb controls must be operable in both redundant and tandem modes. Given that the left and right thumb controls must operate in that manner, as well as be ergonomic, it makes logical sense that they are mirror images of one another.

#### d)      *Conclusion*

In sum, the Court finds that the intrinsic evidence and extrinsic evidence support the conclusion that the limitation in Claims 1 and 9 that "two spaced thumb controls are symmetrically arranged on each side of the center line of the display screen" means "two spaced thumb controls corresponding in size, shape and position on each side of the centerline of the display screen."  The Court now turns to the second part of its analysis, which addresses whether the accused devices, i.e., the Game Boy Advance and the Game Boy Micro, infringe those claims.

### B.   INFRINGEMENT ANALYSIS

Patent infringement may be proven by direct or literal infringement, or under the doctrine of equivalents.  Gen. Elec. Co. v. Int'l Trade Com'n, 670 F.3d 1206, 1214 (Fed. Cir. 2012).  Quintal alleges both theories of patent infringement, which are addressed below.

### 1.      Direct Infringement

"Direct infringement requires proof by preponderant evidence that the defendant . . . uses (if a product claim) each element of a claim, either literally or under the doctrine of equivalents."  Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc., 725 F.3d 1341, 1348 (Fed. Cir. 2013).  A claim is "literally infringed" if each properly construed claim element directly reads on the accused product or process.  Jeneric/Pentron Inc. v. Dillon Co., 205 F.3d 1377, 1382 (Fed. Cir. 2000).  If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law.  Amgen Inc. v. F. Hoffman-LA Roche Ltd., 580 F.3d 1340, 1374 (Fed. Cir. 2009).  "[A] literal infringement issue is properly decided upon summary judgment when no genuine issue of material fact exists, in particular, when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device."  Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998).

The Court has construed the claim limitation "two spaced thumb controls are symmetrically arranged on each side of the center line of the display screen" to mean "two

1   spaced thumb controls corresponding in size, shape and position on each side of the

2   centerline of the display screen."  As shown in the depictions of the Game Boy Advance,

3   Game Boy Micro and Game Boy DS (shown below), each device contains a cross-shaped

4   button mounted on the left side of the centerline of the display screen, and two or more

5   staggered buttons on the right.  See Hamilton Decl. Exs. H, L.  As such, the buttons located

6   on the left and right sides of the display screen do not correspond in shape, size or position

7   on each side of the centerline of the display screen, and hence, do not infringe Claims 1 or 9

8   of the '944 Patent.

### Nintendo DS



### Game Boy Advance



### Game Boy Micro



Quintal contends that Nintendo's emphasis that the Game Boy devices have buttons of different shapes and sizes on either side of the display screen is a "red herring" because "the <u>clusters of controls</u> remain symmetrically arranged."  Pl.'s Opp'n, Dkt. 49 at 21-22 (emphasis added).  However, the patent claims at issue require "<u>two spaced thumb controls</u> mounted on the front of the pocketsize unit. . . . wherein the . . . <u>two spaced thumb controls</u> are symmetrically arranged on each side of the display screen."  '944 Patent, col. 18 ll. 26-28 (emphasis added).  The claims do not recite or otherwise relate to symmetrically arranged "groups" or "clusters of controls."  Thus, to meet the limitations recited in Claims 1 and 9, Quintal must identify at least one thumb control on the left side of the console that is "symmetrically arranged" with at least one thumb control on the right side.  Thus, even if Quintal were correct that "symmetrically arranged" means only locational symmetry, the accused devices still would not infringe Claims 1 and 9, which explicitly teach the use of two thumb-operated buttons—not multiple buttons on each side of the display screen.

## 2.     Doctrine of Equivalents

Where an accused device does not literally infringe, a patentee may prove infringement under the doctrine of equivalents.  <u>Kemco Sales, Inc. v. Control Papers Co.</u>, 208 F.3d 1352, 1364 (Fed. Cir. 2000).  Under this doctrine, infringement may be found only "if every limitation of the asserted claim, or its 'equivalent,' is found in the accused subject matter, where an 'equivalent' differs from the claimed limitation only insubstantially."  <u>Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.</u>, 149 F.3d 1309, 1315 (Fed. Cir. 1998).  "An element in the accused product is equivalent to a claim limitation if the differences between the two are 'insubstantial' to one of ordinary skill in the art."  <u>Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.</u>, 305 F.3d 1303, 1315 (Fed. Cir. 2002).  To oppose a defendant's motion for summary judgment of non-infringement under the doctrine of equivalents, the plaintiff has the burden of producing "particularized testimony and linking argument on a limitation-by-limitation basis that create[s] a genuine

1   issue of material fact as to equivalents." AquaTex Indus., Inc. v. Techniche Solutions, 479

2   F.3d 1320, 1328-29 (Fed. Cir. 2007).[7]

### a)        Prosecution History Estoppel

4          Nintendo contends that Quintal is estopped from relying on the doctrine of

5   equivalents on the ground that, during the patent prosecution process, the "symmetrically

6   arranged" language was added as a narrowing amendment to avoid prior art.  "The doctrine

7   of prosecution history estoppel bars a patentee from asserting as an equivalent subject

8   matter surrendered during prosecution of the patent application." Eagle Comtronics, 305

9   F.3d at 1316.[8]  If a claim is narrowed for any reason related to patentability, "the inventor is

10  deemed to concede that the patent does not extend as far as the original claim." Festo Corp.

11  v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 737-38 (2002); Glaxo

12  Wellcome, Inc. v. Impax Labs., Inc., 356 F.3d 1348, 1352 (Fed. Cir. 2004) (stating that if a

13  claim is so narrowed, it is presumed "that the patentee surrendered the territory between the

14  original claims and the amended claims").

15         "The first question in a prosecution history estoppel inquiry is whether an

16  amendment filed in the Patent and Trademark Office [] has narrowed the literal scope of a

17  claim.  If the amendment was not narrowing, then prosecution history estoppel does not

18  apply." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 344 F.3d 1359, 1366

19  (Fed. Cir. 2003) (internal citation omitted).  Here, the record shows that the patent examiner

20  added the "symmetrically arranged" limitation due to his concern that the '944 Patent

21  would be deemed anticipated or obvious in light of the prior art.  He noted that the newly-

22

23          [7] A court may determine infringement on summary judgment when no reasonable
    jury could find that every limitation recited in the properly construed claim either is or is
24  not found in the accused device. EMD Millipore Corp. v. AllPure Techs., Inc., 768 F.3d
    1196, 1200-201 (Fed. Cir. 2014).
25
            [8] The Federal Circuit has "recognized that prosecution history estoppel can occur . . .
26  in one of two ways, either (1) by making a narrowing amendment to the claim
    ('amendment-based estoppel') or (2) by surrendering claim scope through argument to the
27  patent examiner ('argument-based estoppel')." Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,
    460 F.3d 1349, 1363 (Fed. Cir. 2006).  Nintendo's argument is predicated upon
28  amendment-based estoppel.

added "symmetrically arranged" limitation was among "key features of the claimed invention that are not taught or fairly suggested by the prior art."  Hamilton Decl., Ex. B, Dkt. 45-7 at 7.  Notably, the examiner pointed out that the "closest prior art Matthews (5,432,510) teaches [a] data input device [that] includes an ergonomic arrangement of keys on [a] casing"—but that the Matthews reference, whether considered individually or in combination of other prior art, did not read on the specified limitations, as amended.  Id.  In other words, the examiner deemed it necessary to add the "symmetrically arranged" limitation to narrow the claims in order to avoid any potential anticipation or obviousness issues.[9]

Quintal argues that subsequent findings made by the examiner prove that the claims were not narrowed.  As noted, after the examiner amended the inventor's claims and issued the Notice of Allowance, the inventor submitted an Amendment After Allowance in which he sought to correct a typographical error and add a clarification that the finger and thumb controls must be symmetrically arranged on each side "of the centerline" of the display screen.  Hamilton Decl. Ex. C, Dkt. 45-8.  After the examiner and inventor discussed the matter by telephone, the examiner concluded that the "[the Amendment After Allowance] is proper and is not effected [sic] the scope of the invention."  Martinez Decl. Ex. 13, Dkt. 52-5 at 3.  Quintal seizes upon the examiner's comment that the claims were "not effected" as proof that the examiner's addition of "symmetrically arranged" did not narrow the patent claims.  Pl.'s Opp'n, Dkt. 49 at 6.  This contention lacks merit.  In making that remark, the examiner was referring to the effect of the inventor's proposed amendment in the Amendment After Allowance, not his (the examiner's) original amendment as set forth in the Notice of Allowance.  Thus, the Court rejects Quintal's contention that the amendment was not narrowing.

---

[9] Quintal claims that the examiner's amendment was "not made to overcome rejection base on the Matthews patent . . . ."  Dkt. 49 at 22.  As set forth above, the Court disagrees with that assertion.  But whether or not the amendment was made in response to a particular prior art reference is inapposite.  The salient question is whether the amendment was made to secure patentability.

Having concluded that the amendment was narrowing, the Court turns to the next inquiry, which "is whether the reason for that amendment was a substantial one relating to patentability." Festo, 344 F.3d at 1366-67. "When the prosecution history record reveals no reason for the narrowing amendment, [the law] presumes that the patentee had a substantial reason relating to patentability; consequently, the patentee must show that the reason for the amendment was not one relating to patentability if it is to rebut that presumption." Id. at 1366. Quintal argues that the addition of "symmetrically arranged" to Claims 1 and 9 was not intended to avoid rejection under the Matthews prior art reference, but was only intended to "clarify" the patent claims. Dkt. 49 at 22. However, the examiner made a point of stating that the prior art taught "the ergonomic arrangement of keys," it did not disclose a "pocket-size unit" containing "symmetrically arranged" finger and thumb controls. Hamilton Decl. Ex. C, Dkt. 45-7 at 7. Under Quintal's reading of the Notice of Allowance, the examiner's findings would be superfluous.

Finally, "[if] the court determines that a narrowing amendment has been made for a substantial reason relating to patentability . . . then the third question in a prosecution history estoppel analysis addresses the scope of the subject matter surrendered by the narrowing amendment." Festo, 344 F.3d at 1367. Quintal claims that Nintendo has failed to address this inquiry. But it is presumed "that the patentee has surrendered all territory between the original claim limitation and the amended claim limitation," unless the patentee can rebut the presumption of total surrender. Id. In this case, the subject matter surrendered as a result of the amendment is the required design insofar as the finger and thumb controls are concerned, which now must be "symmetrically arranged." Accordingly, the Court is persuaded that the doctrine of prosecution history estoppel precludes Quintal from relying on the doctrine of equivalents in this action.

### b)    *Merits*

Even if it were not precluded from claiming infringement under the doctrine of equivalents, Quintal has failed to make a sufficient showing of equivalence to survive summary judgment. "To find infringement under the doctrine of equivalents, any

differences between the claimed invention and the accused product must be insubstantial." Virnetx, Inc. v. Cisco Systems, Inc., 767 F.3d 1308, 1322 (Fed. Cir. 2014). "Insubstantiality may be determined by whether the accused device performs substantially the same <u>function</u> in substantially the same <u>way</u> to obtain substantially the same <u>result</u> as the claim limitation." Id. (emphasis added). Thus, where the moving party has demonstrated its entitlement to summary judgment of no literal infringement, the plaintiff then has the burden of producing "particularized testimony and linking argument on a limitation-by-limitation basis that create[s] a genuine issue of material fact as to equivalents." AquaTex Indus., Inc. v. Techniche Solutions, 479 F.3d 1320, 1328-29 (Fed. Cir. 2007) (affirming grant of summary judgment of non-infringement where plaintiff failed to demonstrate a genuine issue of material fact under the doctrine of equivalents by only providing lawyer argument and generalized testimony about the accused product).

Quintal argues that the buttons on the accused devices perform the same <u>function</u>— i.e., "data input or game playing via button depressing"—as the claimed symmetrically arranged controls. However, this function bears no relation to the limitation at issue, since any "two spaced thumb controls" would perform Quintal's proposed function irrespective of how the buttons are arranged, effectively writing "symmetrically" out of the claim. Moreover, Quintal has failed to proffer "particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device or process, or with respect to the 'function, way, result' test . . . ." Am. Calcar, Inc. v. Am. Honda Motor Co., Inc., 651 F.3d 1318, 1338-39 (Fed. Cir. 2011). The expert testimony presented by Quintal in this regard is entirely conclusory and is insufficient to create a question of fact under the doctrine of equivalents. Id. ("generalized testimony as to the overall similarity between the claims and the accused infringer's product from one of the inventors does not suffice to create a genuine issue of material fact.").[10] The Court

---

[10] Quintal's expert, John Wharton, states: "Even if the components within the symmetrically arranged controls were not the same size and shape, they would nonetheless perform substantially the same function in substantially the same way to obtain the same result." Wharton Decl. ¶ 21, Dkt. 49-1.

1   therefore finds that Quintal has failed to raise a material question of fact as to whether

2   Nintendo's accused Game Boy devices infringe under the doctrine of equivalents.

3       **C.    RULE 56(D) REQUEST**

4           In a footnote, Quintal seeks a continuance of the instant motion, see Pl.'s Opp'n,

5   Dkt. 49 at 23 n.8, pursuant to Federal Rule of Civil Procedure 56(d), which allows a court

6   to defer consideration of a summary judgment motion where "a nonmovant shows by

7   affidavit or declaration that, for specified reasons, it cannot represent facts essential to

8   justify its opposition."  To obtain relief under this rule, "[t]he requesting party must show:

9   (1) it has set forth in affidavit form the specific facts it hopes to elicit from further

10  discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose

11  summary judgment."  Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp., 525

12  F.3d 822, 827 (9th Cir. 2008).  The "[f]ailure to comply with these requirements is a proper

13  ground for denying discovery and proceeding to summary judgment."  Id. (internal

14  quotation marks omitted).  Setting aside that it is improper for a party to present a

15  substantive request in a footnote devoid of any meaningful analysis, see City of Emeryville

16  v. Robinson, 621 F.3d 1251, 1261 n.9 (9th Cir. 2010), Quintal has otherwise failed to make

17  the requisite showing for a Rule 56(d) request, which is therefore denied.

18  **IV.    CONCLUSION**

19          For the reasons set forth above,

20          IT IS HEREBY ORDERED THAT Defendants' Motion for Summary Judgment is

21  GRANTED.  The Clerk shall close the file and terminate all pending matters.

22          IT IS SO ORDERED.

23  Dated:  July 17, 2015

    *Saundra B Armstrong*

24  SAUNDRA BROWN ARMSTRONG
    United States District Judge